# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 11, 2024                 Decided August 6, 2024

No. 23-7036

AGUDAS CHASIDEI CHABAD OF UNITED STATES, A
NON-PROFIT RELIGIOUS CORPORATION,
APPELLEE

v.

RUSSIAN FEDERATION, A FOREIGN STATE, ET AL.,
APPELLEES

TENEX-USA INCORPORATED,
APPELLANT

———

Consolidated with 23-7037

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:05-cv-01548)

———

*Carolyn B. Lamm* and *Nicolle Kownacki* argued the cause
for appellant TENEX-USA, Inc.  With them on the briefs were
*Jacqueline L. Chung* and *Ena Cefo.*

2

*Wesley W. Whitmyer, Jr.* and *David C. Tobin* were on the briefs for appellant State Development Corporation VEB.RF.

*Robert P. Parker* argued the cause for appellee. With him on the brief were *Steven M. Lieberman* and *Paul S. Macri.*

Before: Srinivasan, *Chief Judge*, Wilkins and Childs, *Circuit Judges*.

Opinion of the Court filed by *Chief Judge* Srinivasan.

Srinivasan, *Chief Judge*: For the third time, we consider an appeal in this long-running lawsuit brought by Agudas Chasidei Chabad of United States to reclaim religious property unlawfully expropriated by the Russian state. Years ago, Chabad obtained a default judgment against the Russian Federation and several of its agencies along with an order directing them to return the expropriated property. The defendants ignored that order, so the district court imposed monetary sanctions against them, payable to Chabad. The sanctions have now accrued to over $175 million and have been made enforceable through interim judgments.

This appeal arises out of Chabad's attempt to collect on those sanctions judgments by attaching the property of three companies it contends the Russian Federation owns and controls. We hold that Chabad may not do so. As a foreign state, the Russian Federation has sovereign immunity from civil suits unless its immunity has been abrogated by the Foreign Sovereign Immunities Act. The district court believed that it had jurisdiction over the Russian Federation pursuant to that Act's "expropriation exception" to immunity. Our precedents, however, establish that the expropriation exception is inapplicable in the circumstances of this case. The district

3

court thus does not have—and has never had—jurisdiction over Chabad's claims against the Russian Federation.

Because the district court entered the default judgment and sanctions judgments against the Russian Federation in excess of its jurisdiction, those judgments are void as against the Federation. And without the judgments against the Federation, there is no predicate for Chabad to attach the property of companies the Federation allegedly owns and controls. We vacate the district court's decision concluding otherwise.

I.

A.

Agudas Chasidei Chabad of United States (Chabad) is a religious movement of Russian origin dating back to the 1700s. Over its first century and a half, Chabad accumulated a library of more than 12,000 volumes containing its history and central teachings (the Library). It also compiled an archive of the writings of its spiritual leaders, or Rebbes, documents it considers sacred (the Archive). Collectively, the Library and the Archive are known as "the Collection." As our first decision in this case recognized, "[t]he religious and historical importance of the Collection to Chabad . . . can hardly be overstated." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n* (*Chabad I*), 528 F.3d 934, 938 (D.C. Cir. 2008).

During the twentieth century, the Soviet Union took both pieces of the Collection from Chabad—the Library in the 1920s and the Archive after the end of World War II. Since their expropriation, the Library and Archive have resided in Russia in the custody of government agencies now called the

4

Russian State Library (RSL) and the Russian State Military Archive (RSMA).

B.

Chabad filed this lawsuit in 2004, naming as defendants the Russian Federation, the RSL, the RSMA, and the Russian Ministry of Culture and Mass Communications. Chabad sought, among other relief, an order directing the Collection's return.

As a basis for jurisdiction, Chabad invoked the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1330, 1602 *et seq*. The FSIA affords a blanket grant of immunity to foreign states (and their agencies and instrumentalities) from the civil jurisdiction of American courts, subject to certain exceptions. *Id.* §§ 1604–1611. Chabad relied on the FSIA's so-called "expropriation exception," which allows courts to hear certain claims against foreign states involving "property taken in violation of international law." *Id.* § 1605(a)(3).

The case first reached our court after the district court granted in part the defendants' motion to dismiss. The district court held that, under the FSIA's expropriation exception, it had jurisdiction over Chabad's claims against the RSMA but not over its claims against the RSL. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 466 F. Supp. 2d 6, 19–20, 31 (D.D.C. 2006). We affirmed in part and reversed in part, concluding that the district court had jurisdiction over both. *Chabad I*, 528 F.3d at 939, 955.

But neither the district court nor our court examined whether there was jurisdiction over Chabad's claims against the Russian Federation itself or whether the Federation instead was immune from suit. Although our opinion remarked that

5

we "reverse [the district court's] finding of *Russia's* immunity," just what precisely we meant by that statement vis-à-vis the Russian Federation is unclear, since we at times in the opinion referred to all the defendants collectively as "Russia" and conducted no analysis specific to the Russian Federation. *Id.* at 955 (emphasis added); *see generally De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1105–06 (D.C. Cir. 2017).

The upshot of *Chabad I* was that all the defendants, including the Russian Federation, remained in the case. In the wake of our decision, however, the defendants withdrew from the litigation. The Russian Federation, speaking on behalf of itself and its agencies, asserted its belief that "a Court in the United States does not have the authority to adjudicate rights in property that in most cases always has been located in the Russian Federation." Statement with Respect to Further Participation at 1 (June 26, 2009), J.A. 92. The Federation thus concluded that further participation in the case would be inconsistent with its "sovereignty." *Id.* at 2, J.A. 93.

Approximately a year later, the district court granted Chabad a default judgment against all defendants and ordered them to surrender the Collection. After the defendants failed to comply, the court imposed contempt sanctions, requiring the defendants to pay Chabad $50,000 per day until they returned the Collection. The defendants, though, neither paid the sanctions nor returned the Collection. In the ensuing years, the court entered interim judgments of accrued sanctions, which now total more than $175 million.

C.

Unable to execute directly against the assets of the absent defendants to satisfy the accumulating sanctions judgments,

6

Chabad looked elsewhere. It sought, in particular, to collect from entities in the United States with connections to the Russian state. That effort eventually led Chabad to Tenex-USA, a third-tier subsidiary of the Russian State Atomic Energy Corporation, and State Development Corporation VEB.RF (VEB), a Russian state development bank. *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n* (*Chabad II*), 19 F.4th 472, 474–75 (D.C. Cir. 2021).

Our second decision in this case, *Chabad II*, followed Chabad's efforts to subpoena information from Tenex-USA and VEB about their assets and ownership. *Id.* As relevant here, Tenex-USA responded to the subpoena by seeking partial vacatur of the default judgment and sanctions judgments pursuant to Federal Rule of Civil Procedure 60(b). *Id.* Tenex-USA argued that the district court lacked jurisdiction over Chabad's claims against the Russian Federation under the FSIA's expropriation exception. *Id.* at 475. And Tenex-USA maintained that, absent jurisdiction as to the Russian Federation, there was no basis for Chabad to seek attachment of Tenex-USA's assets based on its alleged ties to the Federation. *Id.*

We disposed of *Chabad II* without reaching that jurisdictional question. We held that, regardless of the district court's jurisdiction over the Russian Federation, Tenex-USA could not invoke Rule 60(b) to void the judgments against the Russian Federation. *Id.* at 477. That rule allows only "a party or its legal representative" to seek relief from judgment. Fed. R. Civ. P. 60(b). And Tenex-USA was neither a party to the judgments—the parties instead were the Russian Federation

and its agencies—nor any party's legal representative. *Chabad II*, 19 F.4th at 477.

The case thus returned to the district court. Chabad then moved to attach the U.S. property of Tenex-USA, its parent company Tenex Joint-Stock Company (Tenex JSC), and VEB, and to execute on that property to satisfy the sanctions judgments it held against the Russian Federation. Chabad argued that all three companies were alter egos of the Russian Federation and that their property should be considered Russian Federation property for purposes of enforcing the judgments.

The district court denied Chabad's motion without prejudice. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 659 F. Supp. 3d 1, 3 (D.D.C. 2023). The court first held that Chabad had satisfied the FSIA's expropriation exception as to the Russian Federation, so the Federation lacked immunity with respect to the judgments entered against it. *Id.* at 7–10. The court next concluded that, for the most part, Chabad had satisfied a separate FSIA exception to the immunity from attachment that the FSIA otherwise confers on foreign state property. *Id.* at 10–11.

While the court ruled in Chabad's favor in those respects, it further determined that Chabad had not fulfilled the FSIA's requirement to provide notice of a default judgment to a defendant before attaching its assets to satisfy the judgment. *Id.* at 11–15 (citing 28 U.S.C. § 1610(c)). Although Chabad had served the default judgment on the Russian Federation, it had not served the sanctions judgments. *Id.* at 12–15. The court therefore denied Chabad's motion without prejudice, directing Chabad to serve the sanctions judgments on the Russian Federation and then file a renewed attachment motion. *Id.* at 15. Because the court rested its decision on lack of notice,

8

it did not resolve whether the property of Tenex JSC, Tenex-USA, or VEB is in fact property of the Russian Federation to which Chabad has a legitimate claim. *Id.*

VEB and Tenex-USA now appeal. They argue, among other things, that the district court erred in asserting jurisdiction over Chabad's claims against the Russian Federation under the FSIA's expropriation exception. (Because Tenex-USA purports to speak only for itself, not Tenex JSC, we refer almost entirely to Tenex-USA throughout the remainder of the analysis. And because VEB raises no arguments of its own and merely incorporates those of Tenex-USA, we generally do not refer separately to VEB, although most of what we say about Tenex-USA applies to VEB too.)

II.

We begin by confirming our jurisdiction over this appeal. Chabad raises four jurisdictional objections, none of which has merit.

First, Chabad contends that Tenex-USA lacks standing to appeal a decision in its favor—viz., the district court's denial of Chabad's attachment motion. Chabad is correct that, in general, "a party cannot appeal from a favorable judgment." 15A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3902 (3d ed. 2023); *see also California v. Rooney*, 483 U.S. 307, 311 (1987) (per curiam). The district court, though, did not deny Chabad's attachment motion outright; instead, it denied the motion *without prejudice*. And a party is "within its rights to appeal a dismissal without prejudice on the grounds that it wants one with prejudice." *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 885 (D.C. Cir. 2014) (citation and internal quotation marks omitted).

9

The reason is that an order dismissing a case (or, as here, denying an attachment motion) without prejudice "subject[s] the defendant to the risk . . . of further litigation." *Disher v. Info. Res., Inc.*, 873 F.2d 136, 138 (7th Cir. 1989). That is the case here. The district court's order expressly contemplates that Chabad will "file its motion again" and "have the opportunity and authority to collect upon a renewed motion." *Agudas Chasidei Chabad of U.S.*, 659 F. Supp. 3d at 15. But if Tenex-USA had gotten the ruling it wanted—a denial of Chabad's motion *with prejudice*—further proceedings would be foreclosed, and Tenex-USA would be out of the case. Tenex-USA may take this appeal in an effort to achieve that more favorable outcome.

Second and similarly, Chabad argues that Tenex-USA seeks to appeal the district court's reasoning, rather than its judgment, contrary to the basic principle that a party may only appeal "judgments, not opinions." *United States v. Simpson*, 430 F.3d 1177, 1184 (D.C. Cir. 2005) (citation and internal quotation marks omitted). But Tenex-USA in fact asks us to review a judgment—or, more accurately, an order—not merely an opinion. Tenex-USA seeks review of the portion of the district court's order that denies Chabad's motion without prejudice rather than with prejudice. And because we may review an order to that effect, we also may review the reasons the court denied the order without prejudice rather than with prejudice. *See El Paso Nat. Gas*, 750 F.3d at 885.

Third, Chabad maintains that we already determined in *Chabad II* that Tenex-USA lacks standing to raise the issue of the Russian Federation's immunity. Chabad misunderstands *Chabad II*'s holding. *Chabad II*, as noted, held that Tenex-USA could not attack the judgments in this case through a Rule 60(b) motion because Tenex-USA was not "a party or its legal representative" in the litigation resulting in those judgments.

10

19 F.4th at 477 (quoting Fed. R. Civ. P. 60(b)).  But *Chabad II* did not foreclose the possibility of Tenex-USA ever raising a sovereign-immunity argument.

In fact, the court specifically recognized that VEB—identically situated to Tenex-USA—could have raised such an argument in an appeal of the denial of its motion to quash Chabad's subpoena.  *Id.* at 476.  And rightly so:  a nonparty may challenge an order on sovereign-immunity grounds if the nonparty "has an interest that is affected" by the order—as long as it does so through an appropriate procedural vehicle. *Aurelius Cap. Partners v. Republic of Argentina*, 584 F.3d 120, 127–28 (2d Cir. 2009); *see Pinson v. Samuels*, 761 F.3d 1, 7 (D.C. Cir. 2014); *Broidy Cap. Mgmt. LLC v. Muzin*, 61 F.4th 984, 991 (D.C. Cir. 2023).  The district court's order plainly affects Tenex-USA's interest in its United States property.  So even if Tenex-USA could not protect that interest through a Rule 60(b) motion, it can do so in this appeal.

Finally, Chabad submits that the denial without prejudice of its attachment motion cannot be appealed until the district court's proceedings have come to an end.  It is true that our jurisdiction ordinarily is limited to appeals from "final decisions of the district courts" that end the litigation on the merits.  28 U.S.C. § 1291.  But under the collateral order doctrine, there is a "'small class' of collateral rulings that, although they do not end the litigation, are appropriately deemed 'final'" and immediately appealable.  *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–46 (1949)).

The district court's ruling that it has jurisdiction over the Russian Federation under the FSIA's expropriation exception meets the three conditions that render an interlocutory decision an immediately appealable collateral order.  *See Johnson v.*

11

*Jones*, 515 U.S. 304, 310–11 (1995). First, the court conclusively decided that it has jurisdiction. *See Agudas Chasidei Chabad of U.S.*, 659 F. Supp. 3d at 10. Second, the issue of a court's jurisdiction over claims against a foreign state is important and separate from the ultimate merits question in the ongoing collection proceedings: whether Tenex-USA's property is in fact attachable. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). And third, the denial of sovereign immunity is "effectively unreviewable on appeal from a final judgment." *Id.* (citation and internal quotation marks omitted); *see EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 205 (2d Cir. 2012) (explaining that "[i]n post-judgment litigation," the relevant final judgment is the "judgment that concludes the collection proceedings"). "[S]overeign immunity," we have explained, "is an immunity from trial and the attendant burdens of litigation, and not just a defense to liability on the merits." *Kilburn*, 376 F.3d at 1126 (citation and internal quotation marks omitted); *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 443 (D.C. Cir. 1990).

Because our conclusion as to the Russian Federation's immunity suffices to resolve this appeal, and because a particular ruling in an order may be immediately appealable even if the order in its entirety is not, *see Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 527–28 (D.C. Cir. 2018), we need not consider whether we have jurisdiction at this time to review other rulings in the district court's order.

III.

Tenex-USA's primary submission is that the district court lacks—and has always lacked—jurisdiction over Chabad's claims against the Russian Federation. Accordingly, Tenex-USA says, the default judgment and sanctions judgments the

12

court entered against the Russian Federation are void.  And as a result, Chabad is without a legal predicate to attach Tenex-USA's property in satisfaction of those judgments, even assuming that property is Russian Federation property in the relevant sense (which Tenex-USA vigorously denies).

We agree with Tenex-USA's argument:  under our precedents, the FSIA's expropriation exception does not abrogate the Russian Federation's sovereign immunity in the circumstances of this case.  And we reject Chabad's contention that, even if the district court lacks jurisdiction over its claims against the Russian Federation, the principle of jurisdictional finality precludes us from giving effect to that conclusion at this stage of the proceedings.

A.

1.

The FSIA establishes that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless an exception to immunity applies.  28 U.S.C. § 1604.  The sole exception in play in this case is the "expropriation exception."  That exception divests foreign sovereign immunity "in any case"

> **[1]** in which rights in property taken in violation of international law are in issue and **[2A]** that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or **[2B]** that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the

13

> foreign state and that agency or
> instrumentality is engaged in a
> commercial activity in the United
> States . . . .

*Id.* § 1605(a)(3) (bracketed labels added). A district court thus has jurisdiction over claims against a foreign state or its agencies and instrumentalities under the expropriation exception if rights in property are at issue, that property has been taken in violation of international law, and the appropriate "commercial-activity nexus requirement" is satisfied. *De Csepel*, 859 F.3d at 1104.

In *Simon v. Republic of Hungary*, 812 F.3d 127, 146 (D.C. Cir. 2016), *rev'd in part on other grounds sub nom. Fed. Republic of Germany v. Philipp*, 592 U.S. 169 (2021), we held that "[t]he nexus requirement differs somewhat for claims against the foreign state . . . as compared with claims against an agency or instrumentality of the foreign state." *Simon* understood clause 2A to be the only path to jurisdiction over claims against a foreign state itself: the property that is the subject of the claims (or property exchanged for it) must be "present in the United States in connection with a commercial activity" that the foreign state "carrie[s] on" in the United States. *Id.* (quoting 28 U.S.C. § 1605(a)(3)). And *Simon* correspondingly read clause 2B to be the only basis for jurisdiction over claims against an agency or instrumentality of a foreign state: the property need not be present in the United States, but it must be "owned or operated by an agency or instrumentality of the foreign state" that is "engaged in a commercial activity in the United States." *Id.*

*Simon* was decided years after *Chabad I*, and *Simon* did not discuss the fact that *Chabad I* apparently kept the Russian Federation in this case. *See* pp. 4–5, *supra*. But under *Simon*'s

14

interpretation of the expropriation exception, the Russian Federation ought to have been dismissed: a claim against a foreign state must fit within clause 2A, which, as noted, requires the expropriated property in issue to be present in the United States. Yet it is undisputed that the expropriated property giving rise to this suit—the Collection—is not present in the United States. Nonetheless, *Chabad I* said (without elaboration) that it was overturning the district court's "finding of Russia's immunity." 528 F.3d at 955.

Although *Simon* did not address that seeming tension with *Chabad I*, our court directly confronted it the following year in *De Csepel v. Republic of Hungary*. *De Csepel*, like this case and *Simon*, was an expropriation-exception suit against a foreign sovereign (Hungary) concerning property located outside the United States. 859 F.3d at 1104–05. The plaintiffs argued that, under *Chabad I*, jurisdiction existed over Hungary even though the expropriated property was not in the United States. *Id.* at 1105. Hungary responded by relying on *Simon*, under which jurisdiction over Hungary could arise only pursuant to clause 2A, which is inapplicable when the property is outside the United States. *Id.* at 1104.

We sided with Hungary, holding that *Simon*'s interpretation of the expropriation exception governed. We reasoned that *Chabad I* had not in fact "*held* that a foreign state loses immunity if the second nexus requirement [clause 2B] is met." *Id.* at 1105 (first alteration in original). "The issue of the Russian state's immunity," we explained, "was completely unaddressed by the district court and neither raised nor briefed on appeal" in *Chabad I*. *Id.* What is more, the *Chabad I* court "did not explain why it kept the Russian Federation in the case." *Id.* It instead "reversed the district court with no explanation at all," *id.* at 1106, stating in a single conclusory sentence that it "reverse[d] [the district court's] finding of

15

Russia's immunity," *id.* at 1105 (quoting *Chabad I*, 528 F.3d at 955) (second alteration in original).  Such a "cursory and unexamined statement[] of jurisdiction," we determined, had "no precedential effect."  *Id.* at 1105–06 (citation and internal quotation marks omitted).  *Simon*, by contrast, had "expressly considered and decided the question of foreign state immunity under the expropriation exception."  *Id.*

We have applied the expropriation exception on more than one occasion since *De Csepel*.  In each instance, we considered ourselves bound by *Simon*'s construction of § 1605(a)(3).  *See Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 399–401 (D.C. Cir. 2018); *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 414 (D.C. Cir. 2018), *rev'd in part on other grounds*, 592 U.S. 169 (2021).  Accordingly, *De Csepel* and our subsequent decisions have consistently held that "a foreign state is immune to claims for the expropriation of property not present in the United States."  *Schubarth*, 891 F.3d at 394–95.

2.

Under *Simon* and *De Csepel*, the expropriation exception cannot provide a basis for jurisdiction over Chabad's claims against the Russian Federation in this case.  The expropriated property those claims involve, the Collection, sits in Russia, not the United States.  And as we have now held several times, expropriated property must be located in the United States for jurisdiction to lie under the expropriation exception over claims against a foreign state.  *Simon*, 812 F.3d at 146.  Even if *Chabad I* could be read to have reached a different conclusion, our decision in *De Csepel* resolved that *Simon*, not *Chabad I*, controls.

In nonetheless concluding that it had jurisdiction over Chabad's claims against the Russian Federation, the district court relied on *Chabad I*.  The court read *Chabad I* to have

16

allowed for jurisdiction over a foreign state under either clause 2A or clause 2B of the expropriation exception. *Agudas Chasidei Chabad of U.S.*, 659 F. Supp. 3d at 8. And it thought that our later decisions—including *Simon* and *De Csepel*—did not mandate a different result, because they departed from *Chabad I*, an earlier and, in the court's view, binding precedent. *Id.* at 9. As the district court saw things, *Chabad I* established the law of the circuit, and it remains the law of the circuit because we have not overruled it en banc. *Id.* at 9–10.

We appreciate that, at one time, there might have been uncertainty about whether *Chabad I* or *Simon* supplied this circuit's law on the proper interpretation of the expropriation exception. But our decision in *De Csepel* definitively settled the matter in favor of *Simon*. We extensively analyzed the issue and squarely held that *Chabad I* did not create "[b]inding circuit law" because it never held "that a foreign state loses immunity if the second nexus requirement is met." *De Csepel*, 859 F.3d at 1105 (alteration in original) (citation and internal quotation marks omitted). *Chabad I*'s passing remark about "Russia's immunity," *De Csepel* emphasized, had "no precedential effect." *Id.* at 1105–06 (citation and internal quotation marks omitted).

*De Csepel*'s authoritative reading of *Chabad I* is now itself binding circuit law, which the district court (and our court) must follow unless we reconsider the issue en banc. Lest any doubt remain about the law in this circuit, we reiterate once again: there is no jurisdiction over a claim against a foreign state under the FSIA's expropriation exception unless the expropriated property is located in the United States. *De Csepel* forecloses reliance on *Chabad I* to conclude otherwise.

17

B.

Chabad advances two reasons why we nevertheless should not apply *Simon* in this case.  The first is readily dismissed: Chabad asks us to reconsider *Simon*'s holding, but we are bound by that holding after *De Csepel*, no less than were the panels in *Schubarth* and *Philipp*.  And in any event, for the reasons explained in *De Csepel*, we would adopt *Simon*'s construction of the expropriation exception even if we were free to interpret the FSIA on a blank slate.  *De Csepel*, 859 F.3d at 1107–08.

Chabad also argues that, even if *Simon* is the law today, the principle of jurisdictional finality precludes us from revisiting the district court's jurisdiction over its claims against the Russian Federation at this stage of the proceedings.  We conclude, however, that jurisdictional finality poses no barrier to our applying our governing precedent in this case.

Under the doctrine of jurisdictional finality, "principles of res judicata apply to jurisdictional determinations—both subject matter and personal."  *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982).  The usual rule is that "[a] party that has had an opportunity to litigate the question of . . . jurisdiction" may not "reopen that question in a collateral attack upon an adverse judgment."  *Id.*

To support application of that principle here, Chabad relies on *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987), in which we described two options available to a defendant who questions the jurisdictional basis of a lawsuit against it.  First, such a defendant "may appear, raise the jurisdictional objection, and ultimately pursue it on direct appeal.  If he so elects, he may not renew the jurisdictional objection in a collateral attack."  *Id.* at 1547.

18

"Alternatively, the defendant may refrain from appearing, thereby exposing himself to the risk of a default judgment. When enforcement of the default judgment is attempted, however, he may assert his jurisdictional objection." *Id.*

According to Chabad, the Russian Federation took option one: it initially appeared in the case, contested jurisdiction, appealed, and lost (in *Chabad I*). That result, Chabad reasons, cannot now be challenged in enforcement proceedings following the default judgment, because a party that appears and challenges jurisdiction cannot "renew the jurisdictional objection in a collateral attack." *Practical Concepts*, 811 F.2d at 1547.

The *Practical Concepts* framework does not control in this case. To begin with, the defendant in *Practical Concepts* had not appeared in the case prior to the entry of a default judgment against it, so only the second path we described was relevant to our disposition. *Id.* at 1545. Nor did we purport to establish any ironclad rule in *Practical Concepts*, stating only that defendants "generally" face the choice we described. *Id.* at 1547. Our use of indefinite language was appropriate, given that equitable considerations and exceptions have always informed the application of res judicata. *See Canonsburg Gen. Hosp. v. Burwell*, 807 F.3d 295, 306 (D.C. Cir. 2015). The *Practical Concepts* passage on which Chabad relies thus provides "generally" applicable guidance, but it does not delimit the full range of permissible outcomes. And several features of the present case persuade us that applying jurisdictional finality is unwarranted.

First, the party now contesting jurisdiction, Tenex-USA, was not a defendant in the case when it was filed or when the district court entered the default judgment. *See Chabad II*, 19 F.4th at 477. Indeed, Tenex-USA had no reason even to be

19

aware of the litigation until it received a subpoena from Chabad in 2019, in the course of post-judgment enforcement proceedings. So we see little reason to deny Tenex-USA the benefit of FSIA law that was clearly established in our circuit by the time Tenex-USA first became involved in the case. After all, the reasoning of *Practical Concepts* by its own terms applies in situations in which the party contesting jurisdiction post-judgment was "[a] defendant who kn[ew] of" the initial action against it. 811 F.2d at 1547. So, while a "party that has had an opportunity to litigate the question of subject-matter jurisdiction may not . . . reopen that question in a collateral attack upon an adverse judgment," *Ins. Corp. of Ireland*, 456 U.S. at 702 n.9, Tenex-USA is not such a party. Rather, Tenex-USA contested jurisdiction at the first opportunity available to it.

We recognize that it remains unresolved whether, notwithstanding its "separate juridical status," *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983), Tenex-USA is in fact an alter ego of the Russian Federation, as Chabad alleges. But even if Chabad is correct on that score, it would not change the jurisdictional finality analysis. The Russian Federation is an indirect shareholder of Tenex-USA. And in general, a judgment against the shareholder of a corporation binds the corporation "only if" the corporation has "notice" of the "action resulting in the judgment" and a "fair opportunity to defend" in that action. Restatement (Second) of Judgments § 59(5) (Am. L. Inst. 1982); 18A Wright & Miller, *supra*, § 4460. There is no suggestion here that Tenex-USA was on notice of this suit or had an opportunity to defend itself prior to the default judgment. What is more, the Russian Federation's actions—with respect to the Collection and in this litigation—are entirely disconnected from its status as an indirect Tenex-USA owner. So it is immaterial to the jurisdictional-finality inquiry

20

whether Tenex-USA's corporate separateness from the Russian Federation should be disregarded for attachment purposes.

In addition, the issue of the Russian Federation's immunity was never adjudicated before entry of the default judgment that now provides the predicate for attachment proceedings against Tenex-USA.  As we explained in *De Csepel*, the Russian Federation's immunity "was completely unaddressed by the district court" in the proceedings that led to *Chabad I* and "neither raised nor briefed on appeal."  859 F.3d at 1105.  The issue then received at best a "drive-by" ruling in our court that did not amount to a precedential holding.  *Id.* at 1106 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)).  And while the district court's later opinion accompanying the default judgment contained a jurisdictional analysis, that analysis was limited to the RSL and RSMA and said nothing specifically about the Russian Federation.  *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 729 F. Supp. 2d 141, 146–48 (D.D.C. 2010).  Given that procedural backdrop and the other considerations weighing against the application of jurisdictional finality, the Russian Federation's immunity need not be forever insulated from examination.

Settling a jurisdictional question correctly—rather than simply settling it—is also particularly important when the question concerns foreign sovereign immunity.  "Actions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States," *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 (1983), and can have serious "diplomatic implications," *Republic of Sudan v. Harrison*, 587 U.S. 1, 19 (2019).  This case is illustrative:  the United States informed the district court several times that the imposition of contempt sanctions on the Russian Federation "risk[ed] damage to significant foreign

21

policy interests." Statement of Interest of the United States at 10 (Aug. 29, 2012), J.A. 145; Statement of Interest of the United States at 6–7 (Feb. 21, 2014), J.A. 166–67.

Mindful of such concerns, the Supreme Court has explained that "the rule of law demands adherence to [the FSIA's] strict requirements." *See Harrison*, 587 U.S. at 19. And we have likewise cautioned that "[i]ntolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 447 F.3d 835, 838–39 (D.C. Cir. 2006) (quoting *Practical Concepts*, 811 F.2d at 1551 n.19). Those considerations do not give foreign states a free pass with respect to jurisdictional finality. But they do counsel in favor of rectifying an evident jurisdictional problem in the circumstances of this case.

Finally, there is no indication of gamesmanship on the part of the Russian Federation or Tenex-USA. It would be a different case if, for instance, the Russian Federation had appeared and contested jurisdiction, determined that its arguments were unlikely to succeed, withdrawn and defaulted, and then strategically reappeared in an attempt to challenge jurisdiction a second time. Or one could imagine a scenario in which a foreign state relied on its agencies or instrumentalities for the specific purpose of raising or re-raising jurisdictional arguments that otherwise would be precluded. In such situations, applying jurisdictional finality would best promote the values preclusion serves—judicial economy and the

22

protection of opposing litigants.  *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979).

But there is no hint of anything like that in this case.  The Russian Federation withdrew from the litigation in 2009.  And nothing in the record indicates that, 15 years on, it is using Tenex-USA to make arguments on its behalf.  Rather, Tenex-USA was a stranger to the case until years after the default judgment, when Chabad served it with legal process in enforcement proceedings.  At that point, Tenex-USA understandably began to challenge the district court's exercise of jurisdiction as inconsistent with our precedents.

For those reasons, the doctrine of jurisdictional finality does not prevent us from applying in this case the interpretation of the FSIA's expropriation exception that governs in our circuit—just as we would do in any other case presenting the issue.

C.

Because the district court lacked jurisdiction over Chabad's claims against the Russian Federation when it entered the default judgment and sanctions judgments, those judgments are void as against the Federation.  Consequently, the judgments may not be enforced through attachment of Tenex JSC's, Tenex-USA's, or VEB's assets.  *See TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 781 (D.C. Cir. 2020).  Chabad's claim on those assets is entirely derivative of its claim on the Russian Federation's assets.  And without a valid judgment against the Russian Federation, it no longer has any such claim.

Though Chabad does not raise the point, we note that a final judgment entered in excess of a court's jurisdiction typically is not void unless "the court that rendered judgment

23

lacked even an arguable basis for jurisdiction." *Lee Mem'l Hosp. v. Becerra*, 10 F.4th 859, 863–64 (D.C. Cir. 2021) (internal quotation marks omitted) (quoting *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271 (2010)). And given the abstruseness of *Chabad I*'s jurisdictional determinations and the fact that *Simon* had yet to be decided, we cannot say there was no arguable basis for the district court's exercise of jurisdiction over the Russian Federation when it entered the default judgment and most of the sanctions judgments. But as *Lee Memorial Hospital v. Becerra* recognized, we have declined to apply the arguable-basis standard in cases involving foreign sovereign immunity when the "objecting party"—here, Tenex-USA—did not "appear[] in the challenged proceeding." *Id.* at 864 (quoting *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1182 (D.C. Cir. 2013)). Since that is the present situation, the judgments against the Russian Federation are void simply because "the issuing court lacked subject-matter jurisdiction, regardless of whether there existed an 'arguable basis' for jurisdiction." *Bell Helicopter*, 734 F.3d at 1181.

Our holding also requires the Russian Federation to be dismissed from the case: absent an applicable FSIA exception, it is immune from Chabad's claims. 28 U.S.C. §§ 1330(a), 1604. In arriving at that conclusion, we do not intend in any way to downplay the wrongs Chabad has suffered or the frustrations it has endured in its hundred-year effort to reacquire its wrongfully taken sacred objects, of which this lawsuit is only the latest chapter. The result we reach is simply a consequence of the statute Congress enacted and the limits it chose to set on claims against foreign states like the Russian Federation. And we do not disturb the district court's exercise of jurisdiction over, or entry of judgment against, the RSL and RSMA. Chabad remains free to proceed against those entities—and perhaps also against the Russian Ministry of

24

Culture and Mass Communications, although the Ministry's amenability to suit has not specifically been addressed to date—as appropriate.

\*    \*    \*    \*    \*

The district court stated that "unless and until it receives a mandate" from this court directing it to dismiss the Russian Federation, it "would continue to assert subject-matter jurisdiction" over the Federation. *Agudas Chasidei Chabad of U.S.*, 659 F. Supp. 3d at 10. This opinion occasions such a mandate. We vacate the district court's order and remand for further proceedings consistent with this opinion.

*So ordered.*